*19*

United States District Court
Southern District of Texas
FILED

JUL 1 6 2002

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| GUILLERMO BERRIOCHOA LÓPEZ; | ) | **C.A. No. B-01-208** |
| TRANSPORTES INTERMEX, S.A. de C.V.; | ) | |
| S' ANTONIO TRANSPORTES, S.A. de | ) | |
| C.V.; JOSÉ SILVINO MAGAÑA LÓPEZ; | ) | |
| JOSÉ ALFREDO MAGAÑA LÓPEZ; | ) | |
| MIGUEL ÁNGEL DE LA ROSA | ) | |
| SANCHEZ; SERVICIO TÉCNICO | ) | |
| AUTOMOTRIZ PERISUR, S.A. de C.V.; | ) | |
| TOMAS DE LA ROSA PARRA; ERNESTO | ) | |
| VALLET HACES; MAX E. BARTON; | ) | |
| CARLOS BERRIOCHOA, | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| vs. | ) | |
|  | ) | |
| NORMAN Y. MINETTA, Secretary of | ) | |
| Transportation, ET AL, | ) | |
|  | ) | |
| Defendants | ) | |
| ———————————————— | ) | |
|  | ) | |

## OPPOSITION TO MOTION TO DISMISS

## I. INTRODUCTION

This lawsuit is an action seeking recovery of damages resulting from the Defendant officials' discrimination against a class of Mexican citizens, denying equal protection of the law and their taking of a property interest without due process of law. The North American Free Trade Agreement (NAFTA) is the law of the United States, and its terms are supreme to inconsistent regulations promulgated by executive branch agencies and contrary Presidential Memoranda. NAFTA created certain property interests for Mexican citizens in that it gave them the right to have processed after December 18, 1995, operating permits from the Defendants to provide land transport services between Mexico and the United States on the same basis as U.S. Citizens. However, the policies implemented by Clinton administration officials and continued by Defendants by following federal regulations that are inconsistent with the requirements of NAFTA, denied equal protection, eliminated the property interests without due process of law, and discriminated based on the national origin of the Plaintiffs.

As alleged in the Complaint, applications approved by Defendants and used by applicants to seek permission from the U.S. federal government to provide land transport services in the United States specifically asked the applicant whether they were a Mexican citizen. If the applicant indicated they were a Mexican citizen, no further action was taken on the application by the Defendants. Plaintiffs had no recourse to dispute or challenge a denial of an application within the agency managed and run by the Defendants, despite the right Congress had given them by passing NAFTA.

Defendants' motion mistakenly asserts that Plaintiffs are citizens and residents of Mexico who claim to be among a class of individuals "entitled to benefits" under NAFTA. Plaintiffs lawsuit, in fact, is not asserting an entitlement to a benefit but is asserting that Plaintiffs were Mexican citizens who were given the right to have applications for operating permits processed by Defendants on the same basis as U.S. Citizens and were denied equal protection of the law and substantive due process when their applications were unilaterally not processed because of their national origin.

1

Defendants contention that "This suit is really a dispute over the United States Implementation and compliance with NAFTA" is incorrect because this lawsuit is really a dispute over a denial of equal protection and substantive due process where Mexican citizens were given the same rights as United States citizens under the law to apply for operating permits to operate in the United States.  Defendants cannot first contend that NAFTA is supreme law and does not provide for a private right of action and then later contradict themselves by arguing that executive branch officials may ignore NAFTA and deny equal protection of the law by not processing Mexican citizens applications, especially when NAFTA itself provides for such operating permits to be processed.

Defendants also mistakenly also assert that this action has its genesis more than six years before any named Defendant assumed his or her current Federal office when, in fact, this lawsuit was filed on December 18, 2001, exactly six years after the Transportation Department's announcement on December 18, 1995 that applications for operating permits by Mexican citizens would not be processed. All named  transportation officials were obviously already in their offices during that six year time period.

Defendants argue that Plaintiffs cannot rely on NAFTA to support a claim because the "treaty"[1] does not provide an individually enforceable right of action, and Congress has explicitly precluded a cause of action.  This lawsuit is not seeking, nor does it require, a finding by this or any Court that NAFTA provides a right of action for these Plaintiffs.  Quite simply, the lawsuit alleges that Defendants have denied equal protection of the law and taken a property interest without due process and is based solely on the national origin of Plaintiffs.  Defendants' argument misses the essence of this Complaint; the issue is whether Plaintiffs have a cause of action under the U.S. Constitution, Civil Rights statutes and under a Bivens theory to seek

---

[1]  NAFTA is not a treaty per se, but rather is an Executive Agreement approved by a simple majority vote in Congress.  Article 2, section 2 of the Constitution requires treaties to be approved by two-thirds of the Senate.  But many international accords, including the North American Free Trade Agreement (NAFTA) and the World Trade Organization, are approved as congressional-executive agreements by simple majorities of both Houses of Congress. See IS NAFTA CONSTITUTIONAL?, Ackerman and Golove, 108 Harv. L.Rev. 799, at 801.

2

redress for denial of equal protection and for the discriminatory taking of property interests without due process of law. Clearly established law prohibits denying equal protection of the law based on National origin and there was no qualified immunity for Defendants' actions.

Defendants continued the policy of refusing to process the applications of Mexican citizens for U.S. operating permits based solely upon their national origin. The right to have their applications processed was given to them under NAFTA. Whether NAFTA provided a private right of action or not, where NAFTA had at least the same weight as federal statute entitling Mexican citizens to have their applications for operating permits processed to service California, Arizona, New Mexico and Texas beginning on December 18, 1995, Defendants could not unilaterally decide to not process those applications based solely on national origin. Furthermore, any of Defendants' arguments for continuing the Executive Branch Officials refusal to process Mexican citizens applications are flawed. Defendants fail to mention that the Executive Branch Official continued to allow Mexican truckers to traverse the entire United States, traveling on interstate freeways, staying at hotels and motels within the United States as long as their destination was Canada. This tends to prove that the Executive Branch Official's "Safety" justification for its continued refusal to process Mexican citizens' applications was a pretext for discrimination based on National origin. In a like manner, the United States argued before an Arbitral panel, that the reason that Mexican citizens' applications for operating permits were not being processed under U.S. Regulations was based upon safety. As Defendants admit in their Motion to Dismiss, the Arbitral panel decided that the U.S. was in violation of the most favored nation treatment of NAFTA when U.S. laws and regulations denied operating authority in the United States to existing carriers if the applicant was a Mexican National.

The very idea that Defendants would ask the applicant for the operating permit, whether he was a Mexican National [note that they do not ask if the applicant is of some other nationality] and would then place anyone who answers that they are a Mexican National in the "do not process" pile is an obvious violation of equal protection where NAFTA specifically gave Mexican citizens the right to apply for those very permits to operate within the United States.

The Court should be mindful of the fact that this national origin discrimination took place within the United States, not in some foreign country. The United States, through a process of negotiation agreed to give Mexican citizens the same right as United States' citizens to apply for operating permits in the United States [albeit as of December 18, 1995, Mexican citizens were to be allowed to operate within the four border states and of January 1, 2001, throughout the entire United States]. While some federal statutes may provide for a private right of action and others may not, as explained infra, a denial of equal protection based upon national origin is actionable under Bivens, even if the federal statute does not provide for a private right of action.

Defendants next argue that this Court does not have jurisdiction over Defendants and that venue is not proper in this District. However, a forum state may exercise general jurisdiction over the Defendant, as to any cause of action if his activities within the forum are "substantial, continuous and systematic". As demonstrated below, Defendants have created substantial, continuous and systematic contacts with Texas by their presence of field offices located within Texas. Moreover, venue is satisfied when a claim is brought in a district where a "substantial part of the events or omissions" occurred. Since the majority of injuries occurred in Brownsville and Loredo, located within Texas, the Southern District of Texas is the appropriate venue for this action.

## II.    ARGUMENT

### A.    THIS COURT HAS JURISDICTION TO HEAR THIS CASE UNDER ITS GENERAL JURISDICTION TO DECIDE ALL CASES ARISING UNDER THE CONSTITUTION, LAWS, OR TREATIES OF THE UNITED STATES AND UNDER A BIVENS THEORY.

The Supreme Court has stated, "[o]ur authority to imply a new constitutional tort, not expressly authorized by statute, is anchored in our general jurisdiction to decide all cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. §1331." Correctional Services Corp. v. Malesko, 122 S.Ct. 515, 519 (2001). In Malesko, the Court recently noted its prior recognition of a Bivens Theory tort where the Court "for the first time [recognized] an implied private action for damages against federal officers alleged to have violated a citizen's

4

constitutional rights." Id. At 519. Although the Court in Malesko chose not to extend the Bivens Theory of recovery from individual Federal Agents to private entities acting under the color of law, it did reaffirm that a Bivens remedy for damages against individual Federal Agents whom have acted unconstitutionally is a valid exercise of the Court's authority.

**B.    PLAINTIFFS HAVE STANDING TO BRING ACTION IN THIS COURT BASED UPON CONSTITUTIONAL GUARANTEES OF THE 5TH AND 14TH AMENDMENTS.**

It is well established law that the guarantees of the First, Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution have been extended to resident aliens. See, e.g., Plyler v. Doe, 457 U.S. 202, 211-212, 102 S.Ct. 2382, 2391-92, 72 L.Ed.2d 786 (1982) (illegal aliens protected by Equal Protection Clause); Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); Bridges v. Wixon, 326 U.S. 135, 148, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103 (1945) (resident aliens have First Amendment rights); Russian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (Just Compensation Clause of Fifth Amendment); Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886) (Fourteenth Amendment protects resident aliens). These cases establish that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country. See, e.g., Plyler, supra, 457 U.S., at 212, 102 S.Ct., at 2392 (The provisions of the Fourteenth Amendment " 'are universal in their application, to all persons within the territorial jurisdiction ...' ") (quoting Yick Wo, supra, 118 U.S., at 369, 6 S.Ct., at 1070); Kwong Hai Chew, supra, 344 U.S., at 596, n. 5, 73 S.Ct., at 477, n. 5.

Defendants point out the Court in United States v. Verdugo limited this application of Constitutional protection to an alien whom has significant voluntary connection with the United States. In that case, the Respondent was an alien who was a Mexican citizen and resident, was

5

arrested in Mexico by Mexican police, and later transported to the United States. In that case, the Court found the alien had <u>no significant voluntary connection</u> with the United States as to warrant the application of the Fourth Amendment's protection against unreasonable searches and seizures by United States agents of property owned by a nonresident alien and located in a foreign country. <u>U.S. v. Verdugo</u>, 494 U.S. 259, 262 (1990).

However, <u>Verdugo</u> is entirely distinguishable from this case. In this case, <u>Plaintiffs have sought voluntary connection with the United States</u> under the auspice of the provisions of the NAFTA treaty, by submitting applications to provide land transport services in the United States and for the opportunity to invest in, control or own U.S. domiciled trucking companies. Moreover, Plaintiff Guillermo Berriochoa Lopez in fact was forced to sell his interest in a U.S.-domiciled trucking firm June 30, 1999, because the operating permit for that firm was in jeopardy if any Mexican citizen were to have an ownership interest. When the NAFTA treaty was enacted, Congress foresaw freedom of movement and business ventures by the class of Plaintiffs in this case. In essence, NAFTA opened the doors to freer commerce amongst the United States and Mexico such that Mexican citizens would gain a vested property right to both provide land transport services and to invest in, control or own U.S. domiciled trucking companies. As such, Plaintiffs are entitled to claim the provisions guaranteed under the U.S. Constitution and the NAFTA treaty as supreme law of the land.

### C. A BIVENS THEORY IS APPLICABLE IN THIS CASE AND PROVIDES A REMEDY TO PLAINTIFFS FOR DEFENDANTS' WRONGFUL TAKING OF A PROPERTY INTEREST WITHOUT DUE PROCESS OF LAW.

#### 1. <u>THE SUPREME COURT FIRST RECOGNIZED AN EQUITABLE REMEDY FOR A VIOLATION OF CONSTITUTIONAL RIGHTS BY INDIVIDUAL FEDERAL AGENTS IN BIVENS.</u>

In 1971, the U.S. Supreme Court held the Petitioner was "entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment." <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u> 403 U.S. 388, 397, 91 S.Ct. 1999, 2005 (1971). In Bivens, the Court found that individual agents acting under color of law and in violation of the command of the Fourth Amendment gave rise to a

cause of action for damages consequent on the agents' unconstitutional conduct. Id. At 389. The premise for the Court's decision was in well settled law, noting "federal courts may use any available remedy to make good the wrong done.' Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777 (1946).

Moreover, the Supreme Court has recognized a Bivens action for violation of the equal protection component of the Due Process Clause of the Fifth Amendment, specifically to gender discrimination. Davis v. Passman, 442 U.S. 228 (1979). Lower courts have held that equal protection under the Due Process Clause of the Fifth Amendment supports Bivens actions alleging age, race and handicap discriminations as well. See, for example, Williams v. Meese, 926 F.2d 994 (10th Cir. 1991). A Bivens action may also be based on a violation of the Fifth Amendment when the plaintiff alleges the existence of a protected property interest and a deprivation of that interest without due process of law. See, for example, Connelly v. Comptroller of Currency, 876 F. 2d 1209 (5th Cir. 1989).

To establish a violation of procedural due process in a Bivens action, the Plaintiff must prove: (1) the existence of a protected property interest; (2) a deprivation of that interest under color of law; and, (3) a lack of due process. Connelly, 876 F.2d at 1211. To show a lack of due process, the Plaintiff must show that the procedures made available were not merely insufficient or even inadequate, but that they were constitutionally inadequate, containing a defect so serious that they were fundamentally unfair. See Mac'Avoy v. Smithsonian Institute, 757 F. Supp. 60 (D.C. 1991); Whitacre v. Davey, 890 F.2d 1168 (1989), cert. denied, 110 S.Ct. 3301 (1990). Circuit Courts have held that where there is a showing of deprivation of such basic due process rights as reasonable notice of a claim and a meaningful opportunity to respond, there is a violation of due process. See Arcoren v. Peters, 829 F.2d 671 (8th Cir. 1987), cert. denied, 485 U.S. 987 (1988).

In addition to the property right conveyed to Plaintiffs by NAFTA, it is necessary to observe that the right to Equal Protection is a separate Constitutional Right to which Plaintiffs are entitled. The Equal Protection Clause indicates that a state may not deny "any person within its jurisdiction the equal protection of the laws," U.S. Constitution, Amendment 14. Swint v.

<u>City of Wadley, Alabama,</u> 51 F.3d 988, 1000, (affirming the district court's finding that "the equal protection right to be free from intentional racial discrimination was clearly established"). This Amendment expressly indicates, that the government is prohibited from treating similarly situated persons differently. <u>Norton v. Village of Corrales</u>, 103 F.3d 928, 933 (10th Cir. 1996) <u>quoting Buckley Constr. Inc., v. Shawnee Civic & Cultural Develop. Auth.</u> 933 F.2d 853, 859 (10th Cir. 1991). Since the Mexican Truckers were entitled under NAFTA to submit the permit applications for processing in the same manner as American Truckers, they were on equal footing to the latter. Any purposeful actions in which an application was not processed (although defendants only claim that the applications were not completely processed) based on discrimination due to race, gender or **national origin** is unlawful. <u>Hedges v. Poletis</u>, 177 F.3d 1071, 1075 (8th Cir. 1999) ("it is unlawful for state officials to discriminatorily enforce the laws against a disfavored class of persons solely on the basis of their membership in that class). If African-American, or female American Truckers were to submit an application and as a group were not processed based on race and or gender, members of these groups would be entitled to equal protection. Similarly, since Mexican Truckers are entitled to be applicants, and have been discriminated against based on their national origin the Mexican Truckers are entitled to Equal Protection, a constitutional right that has been clearly established.

### 2. <u>SUPERVISORY PLAINTIFFS ARE LIABLE UNDER A BIVENS THEORY INDIVIDUALLY UNDER TWO CIRCUMSTANCES: PERSONAL INVOLVEMENT IN THE ACTS CAUSING THE DEPRIVATION OF A PERSON'S CONSTITUTIONAL RIGHTS, OR IMPLEMENTATION OF A POLICY SO DEFICIENT THAT THE POLICY ITSELF ACTS AS A DEPRIVATION OF CONSTITUTIONAL RIGHTS</u>.

The Court in <u>Cronn</u> stated there are two instances when individual Supervisory Plaintiffs will be found personally liable for violation of a Constitutional right. "First, personal involvement in the acts causing the deprivation of a person's constitutional rights creates personal liability ... Second, a supervisory official may be held liable if he implements a policy so deficient that the policy itself acts as a deprivation of constitutional rights. <u>Cronn v. Buffington</u>, 150 F.3d 538, 544 (5th Cir. 1998).

Plaintiffs allege in their Complaint that each individually named Defendant "ha[s] knowingly and with deliberate indifference failed to approve applications for new and existing motor carrier operating permits made and submitted by persons of Mexican national origin, and have discriminated against those persons by reason of their national origin, resulting in the violation of the plaintiff's rights under the Equal Protection and Due Process Clause of Fifth Amendment of the United States Constitution, and the Plaintiff's federal civil rights under 42 U.S.C. § 1981, et seq." Complaint at paragraph 35. Additionally, Plaintiffs plead each named Defendant, "as a matter of policy and as a pattern of practice and custom, have knowingly and with deliberate indifference failed to approve applications made and submitted by persons of Mexican national origin, for the opportunity to invest in, control or own U.S. domiciled trucking companies, and have discriminated against those persons by reason of their national origin, resulting in the violation of the Plaintiff's rights under the Equal Protection Clause and the Due Process Clause of the 5th Amendment of the United States Constitution, and the Plaintiff's federal civil rights under 42 U.S.C. § 1981, et seq." Complaint at paragraph 35. These pleadings show individual personal involvement by asserting named Defendants failed to process and approve applications by Mexican nationals. Additionally, the pleadings allege that as a matter of policy and as a pattern of practice and custom Defendants' with deliberate indifference failed to approve applications. This allegation satisfies the second prong of Supervisory liability by asserting Defendants implemented the policy of not processing applications which in itself is so deficient that it acts as a deprivation of constitutional rights. As such, Plaintiffs have sufficiently pled Supervisory Agent liability under Bivens Theory.

### 3. PLAINTIFFS RECOVERY FOR DAMAGES FROM DEFENDANTS' VIOLATION OF CONSTITIONAL AND STATUTORY RIGHTS WHILE ACTING UNDER COLOR OF THE LAW IS PARAMOUNT TO DEFENDANTS' FLAWED ASSERTION THAT SPECIAL FACTORS EXIST.

Defendants provide two "special factors" that counsel against creating a judicial remedy for the unconstitutional implementation of NAFTA:  the first, recognition of a Bivens remedy would interfere with Executive and Legislative prerogative in the sensitive area of treaties and

9

foreign affairs; and second, it would impinge on NAFTA Article 20's controlling dispute resolution mechanisms agreed upon by NAFTA signatories.

First, Plaintiffs remedies would not impinge on the Executive and Legislative prerogatives in the sensitive area of treaties and foreign affairs because Plaintiffs' claims are based upon Constitutional law, U.S. Statutory law, and Bivens Theory

Courts have held that there is no blanket rule when it comes to deciding whether a political question exists, an "application of the doctrine must be made on a "case-by-case" basis". Baker v. Carr, 369 U.S. 186, 211 (1962). Here, Plaintiffs have asserted Defendants have failed to approve applications by Mexican nationals based upon their origin as evidence of an ongoing and continuous pattern and practice of unlawful discrimination, as well as a violation of the Equal Protection and Due Process Clauses of the Fifth Amendment. This Court must find that no political question exists because the remedies Plaintiffs seek are consistent with NAFTA, and are based upon United States law.

Second, Chapter 20 of NAFTA does not preclude Plaintiffs from seeking remedial application to this Court, but provides instruction for how Parties to the Treaty are to behave in the event of judicial application. The NAFTA, Chapter 20 provides,

> "[i]f an issue of interpretation or application of this Agreement arises in any domestic judicial or administrative proceeding of a Party that any Party considers would merit its intervention, or if a court or administrative body solicits the views of a Party, that Party shall notify the other Parties and its Section of the Secretariat. The Commission shall endeavor to agree on an appropriate response as expeditiously as possible.

NAFTA, Chapter 20, Article 2020(1).

Although Courts have noted, "a money damages remedy against federal officials for constitutional torts will not be devised by the courts where "special factors counse[l] Congress …[s]uch "special factors" include the existence of statutory mechanisms giving meaningful remedies against the United States, even though those remedies do not provide "complete relief" to the claimant. See Schweiker v. Chilicky, 487 U.S. 412 (1988). Yet this case is distinguishable from Chilicky.

In <u>Chilicky</u>, Congress had provided an elaborate remedial scheme that provided a method of review and relief for the petitioners. However, in this instance, neither NAFTA nor the applicable accompanying statutes provide any meaningful form of review or relief for petitioners. Despite Defendants' brazen claim that Chapter 20 of NAFTA provides an elaborate forum of review, a mere cursory review of the Chapter reveals that only Parties to the NAFTA may participate in a primitive dispute process. In fact, the Parties to the agreement did participate according to the terms of this Chapter, when Mexico, in 1998, formally requested the formation of an arbitral panel to hear the dispute of whether by failing to phase out U.S restrictions on cross-boarder trucking and on Mexican investment in the U.S. trucking industry, the U.S. was in violation of the national treatment and most-favored-nation provisions" of NAFTA. On February 1, 2001, the panel issued a final report, finding that the Transportation Department had received 184 applications from Mexican nationals, none of which had been approved. The report revealed U.S. laws and regulations denied operating authority in the U.S. to existing carriers if the applicant is a Mexican national, or the carrier is controlled by Mexican nationals, as well as such authority to newly created U.S. domiciled carriers with Mexican investment. As such, it was and continues to be futile for a Mexican national to file an application.

Moreover, Chapter 20 of the NAFTA, cited by Defendants, incorporates those provisions of Chapter 11 as they pertain to private individuals seeking redress for a claim against a NAFTA government.

Chapter 11 of the NAFTA contains a system for the settlement of disputes between NAFTA investors and the government of another NAFTA Party. The system allows investors, on their own and on behalf of their investments, to claim against governments for the breach of the obligations of the NAFTA Investment chapter. Under Article 1139, entitled "Definitions", Plaintiffs are not "investors". Thus, by its own terms, NAFTA excludes the Plaintiffs from seeking redress under the only Chapter intended by the NAFTA Parties [signatory countries] to be used to settle disputes involving private citizens.

Additionally, neither of the Chapter 11 provisions that give a private person standing to make a claim under NAFTA have language which indicates that the signatory parties to the NAFTA expected those provisions to be an exclusive remedy for a private party. Articles 1116 and 1117 both state that an investor "may" submit to arbitration of a claim under Chapter 11.[2] Neither is there any language in Chapter 11 or in the Chapter pertaining to land transport that refers to Chapter 11 at all, much less referencing it as the exclusive dispute resolution mechanism for a private citizen. More importantly, however, Chapter 11 is obviously geared to protect investors of a more 'classic' type rather than a Mexican citizen who intended to do business in the United States with property or equipment that could be moved as easily as trucks and trailers. In other words, it is clear from the definition of 'investment' in Chapter 11 that the entities the NAFTA governments intended to protect are those who invested in a business in a foreign NAFTA country. Therefore, Chapter 11 provides no remedy, much less an exclusive remedy, to these Plaintiffs who did not invest any money in a business domiciled in the U.S.

**D.    NAFTA IS SUPREME LAW AND PROVIDES MEXICAN NATIONALS THE RIGHT TO SUBMIT APPLICATIONS FOR PERMITS TO PROVIDE CERTAIN TRANSPORTATION SERVICES IN THE UNITED STATES ON SPECIFIC DATES.**

**1.    <u>NAFTA WAS PROPERLY ENACTED INTO FEDERAL LAW</u>.**

---

[2] Article 1116, entitled "Claim by an Investor of a Party on Its Own Behalf," provides:

> 1.  An investor of a Party may submit to arbitration under this Section a claim that another Party has breached an obligation under: (a) Section A or Article 1503(2) (State Enterprises); or (b) Article 1502(3)(a) (Monopolies and State Enterprises) . . . .

Article 1117, entitled "Claim by an Investor of a Party on Behalf of an Enterprise," paragraph 2 states:

> 1.  An investor of a Party, on behalf of an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly, may submit to arbitration under this section a claim that the other Party has breached an obligation under: [same as above].

The NAFTA was implemented through a special congressional process known as Fast Track[3]. Through this process, Congress agrees to limit its power to amend international trade agreements and to vote on such legislation on a very short schedule. Timing is essential under Fast track and is determined around three milestone events:

(1) notification by the President that trade negotiations will begin;
(2) signing of a trade agreement by the President; and
(3) transmittal of the agreement with implementing legislation to Congress.

The first of these milestones was achieved by President George H. Bush when he notified Congress on September 25, 1990, of his intention to negotiate a trade agreement with Mexico. Later, on February 5, 1991, he further notified Congress that Canada would join these negotiations. The second milestone was passed on December 17, 1992, when President Bush, Mexican President Carlos Salinas and Canadian Prime Minister Brian Mulroney signed the final text of the NAFTA. After signing of the Agreement, the President was obliged to send to Congress a copy of the Agreement, an implementing bill and a Statement of Administrative Action. Under Fast Track, Congress was required to hold a yes or no vote on the legislation as submitted. This vote had to occur with 60 Congressional sitting days of the Agreement's introduction.

President Clinton transmitted the NAFTA formally to the House of Representatives as house Resolution 3250 on October 4, 1993. On November 17, 1993, the House of Representatives passed the NAFTA bill by a vote of 234 to 200. On November 19, 1993, the Senate passed the same legislation. This bill became the <u>North American Free Trade Agreement Implementation Act</u> (Public Law 103-182, 107 Stat. 2057). The NAFTA was proclaimed into law in the United States on January 1, 1994 by President Clinton. 58 FR 69681, Executive Order 12889 of December 27, 1993.

---

[3] Fast Track was first provided by §§ 101-102 of the Trade Act of 1974, 19 U.S.C. §§ 2101, 211-2112, 2191 (1988).

## 2. NAFTA IS PARAMOUNT TO PRESIDENTIAL MEMORANDA IMPOSING A MORITORIUM ON MEXICAN TRUCKING IN THE UNITED STATES

Federal law, which includes federal treaties and congressional statutes, are the supreme law of the United States.  U.S. Const. art. VI, § 2; Missouri v. Holland, 252 U.S. 416, 432-33 (1920).  The Constitution does not establish any paramount rules between federal treaty law and federal statutes.  On this question, the Supreme Court has ruled that the most recent provision will be paramount.  Chae Chan Ping v. United States, 130 U.S. 581, 600 (1889).

The NAFTA is an international agreement by an executive agreement and is not a treaty.  Court decisions have determined that for the purposes of the Supremacy Clause, executive agreements are treated like other federal laws in that they can preclude inconsistent state law.  See United States v. Pink, 315 U.S. 203 (1942).  According to the Restatement of Foreign Relations Law, the result binds the United States under international law on any subject "that falls within the powers of Congress and of the President under the Constitution."  Restatement, note 6, § 303(2).  It also functions as the supreme law of the land, trumping inconsistent state laws and prior federal laws and treaties.  Restatement, note 6, § 111(1) cmt.d & rptr. Note2; id. § 115 cmt.c.  In other words, there is no significant difference between the legal effect of a congressional-executive agreement and the classical treaty approved by two-thirds of the Senate.  See id. § 303 cmt. e.  Ackerman and Golove, 108 Harv. L.Rev. 799 at 805.

In the only case where the Supreme Court addressed an issue of the legal nature of an executive agreement, an importer challenged the Collector of Customs' interpretation of certain provisions of the Dingley Tariff.  B. Altman & Co. v. United States, 224 U.S. 583 (1912).  The issue presented was whether the Supreme Court could take jurisdiction of an appeal.  Because the jurisdictional statute referred only to "treaties," the United States urged a narrow construction, hoping to insulate the circuit court's interpretation of executive agreements from Supreme Court review.  The Court disagreed and read the jurisdictional term broadly:

> While it may be true that this commercial agreement . . . was not a treaty possessing the dignity of one requiring ratification by the Senate of the United States, it was an international compact, negotiated between the representatives of two sovereign nations, and made in the name and on behalf of the contracting

14

countries, and dealing with important commercial relations between the two
countries . . . .

As a consequence, the Court construed the word "treaty" in the jurisdictional statute to include

executive agreements authorized by Congress.   Ackerman and Golove, 108 Harv. L.Rev. 799 at

831.

The Bus Regulatory Reform Act of 1982 created a moratorium against issuance of new

motor carrier operating authority to foreign carriers by the Interstate Commerce Commission.

The 1982 Act was supplemented by a Presidential Memorandum signed on September 20, 1982,

excluding application of the Bus Regulatory Reform Act of 1982 moratorium against carriers

from Canada.  However, the Presidential Memorandum  specifically declared that the

moratorium would be enforced against carriers from Mexico.  The September 20, 1982,

Presidential Memorandum was extended uninterrupted with respect to Mexican trucking

companies in 1984, 1986, 1988, 1990, 1992 and 1995.  Clearly, under the rule of  Chae Chan

Ping, the Presidential Memorandum extending the moratorium did not survive the passage of the

NAFTA.

The U. S. Congress provided the President authority to impose a two-year initial

moratorium on foreign carriers under the ICC Termination Act of 1995.  The moratorium  could

be removed or modified if such an action was in accord with the national interest and, if the

foreign country began providing reciprocal access.  On March 2, 1995, President Clinton signed

a Presidential Memorandum extending for two additional years.

Simply put, the 1995 Act gave the President the power to extend the moratorium

provided under the United States Regulatory Reform Act of 1982.  However, under the rule of

Chae Chan Ping, the Presidential Memoranda signed by President Clinton pursuant to the 1995

Act does not rise to become paramount over those provisions of NAFTA that provide the right of

Mexican nationals to seek permission to provide land transport services in the United States.

### 3.   NAFTA PROVIDES MEXICAN NATIONALS THE RIGHT TO SEEK PERMITS TO PROVIDE LAND TRANSPORT SERVICES IN THE UNITED STATES.

Under Annex I of NAFTA, the parties agreed that with respect to cross-border trucking service, individual Mexican nationals would be permitted to obtain operating authority to provide cross-boundary trucking services in the four border states three years after the signing of NAFTA, or December 18, 1995, and cross-border trucking services throughout the United States six years after the date of entry into force of NAFTA, or January 1, 2000.   Annex I also provided that with respect to investment by foreign nationals in U.S. domiciled trucking firms, individual Mexican nationals would be able to invest in such a firm three years after the signing of NAFTA, or December 18, 1995.  Thus, NAFTA provided Mexican nationals with the right to seek permits to operate in the United States and did so unfettered by subsequent Presidential Memoranda to the contrary.

### 4.    APPLICATIONS MADE BY RIGHT WERE NOT CONSIDERED AND RESULTED IN A TAKING WITHOUT DUE PROCESS OF LAW.

When applications were made by those Mexican nationals, they were not processed. There was no system in place that allowed the Plaintiffs to seek redress for the lack of action taken on their applications.  Nor was there any administrative decision made that could be appealed through an administrative process.  In short, there was no process of law afforded to Plaintiffs for redress of the loss of their right to apply or even contest a rejection or denial of their application.  Indeed the Arbitral Panel established to hear Mexico's dispute with the United States concerning the Land Transport provisions of NAFTA found that evidence presented at the arbitration established that as of July 20, 1999, the U.S. Department of Transportation had received 184 applications from Mexican nationals to provide cross-border services into the boarder states.  See Exhibit A at paragraph  87.  None of those applications were processed, denied or granted.

Moreover, the Supreme Court has held distinctions based on ancestry or national origin are "odious to a free people whose institutions are founded upon the doctrine of equality." Hirabayashi v. United States, 320 U.S. 81 (1943); Accord, e.g., Oyama v. California, 332 U.S.

633, 644-46 (1948); Korematsu v. United States, 323 U.S. 214, 216 (1944); Narenji, et. al. v. Civiletti, 481 F.Supp. 1132 (D.C. 1979). In the context of aliens who have been lawfully admitted into the United States, there is no question that aliens are entitled to a full panoply of Constitutional protections enjoyed by citizens of the United States.[4]  In this case, by virtue of the NAFTA terms, especially those contained in Annex I, the invitation by the United States to have Mexican citizens make application is similarly protected by the Constitution. If applications are sought without provision for review or redress for the applicants in the same way there is review and redress for all applicants, then there is a violation of due process and equal protection guaranteed by the Constitution.

    (a)    The Plaintiffs had a Property Interest Pursuant to NAFTA

As is more fully discussed above, Plaintiffs had the right to submit an application for a permit to provide cross-border services to the Department of Transportation. [In DiMartini v. Ferrin, 889 F.2d 922 (9th Cir. 1989, cert. denied, 111 S.Ct. 2796 (1991), the Circuit Court found a Bivens action in a claim that a federal agent interfered with private employment of the Plaintiff, and held that the right to hold specific employment and follow a chosen profession free from third-party governmental interference constitutes both a liberty and a property interest protectable under the Fifth Amendment, even though the employee is at-will. Once granted by Congress, the right to have an application considered is similarly a property interest. The Supreme Court has found that this interest is also protected right under the Fifth Amendment for lawfully admitted aliens.

In Examining Board of Engineers, Architects and Surveyors v. Flores De Otero 426 U.S. 572 (1975), Puerto Rico had a statute that required applicants registering as licensed engineers or architects be citizens of the United States. Plaintiffs Flores de Otero and Perez met all requirements for obtaining a license except the one under question. The Court held that Puerto Rico's prohibition on alien's engaging in the private practice of engineering deprived alien civil engineers of rights, privileges or immunities secured by the Constitution and laws. The Court

---

[4]  In criminal proceedings, aliens enjoy the protection of the fourth, fifth, sixth and eighth amendments. In civil proceedings they are entitled to the same procedural protections as citizens, including the right to a jury trial.

said the Equal Protection Clause of the Fourteenth Amendment and the Due Process Clause of the Fifth Amendment recognized that "(a)liens as a class are a prime example of a 'discrete and insular' minority…for whom…heightened judicial solicitude is appropriate."

The Court's analysis turned on the fact that Flores de Otero and Perez were <u>lawfully admitted</u> aliens, stating. "Once an alien is <u>lawfully admitted</u>, a State may not justify the restriction of the alien's liberty on the ground that it wishes to control the impact or effect of federal immigration laws." (emphasis added) In fact, various courts have found discrimination against legally admitted aliens to be unconstitutional. <u>See</u> <u>Graham v. Richardson</u> 403 U.S. 365 (1971) (finding prohibition in public resources and benefits unconstitutional); <u>Sugarman v. Dougall</u> 413 U.S. 634 (1973) (finding exclusion from public employment unconstitutional); and <u>Yick Wo v. Hopkins</u> 118 U.S.356 (1886) (finding an ordinance that was administered so as to exclude aliens from pursuing a lawful occupation unconstitutional). However, it is not only discrimination against <u>lawfully</u> admitted aliens which is odious to the Constitution. Courts have also found that non-resident aliens also have Constitutionally protected rights.

In <u>Harbury v. Deutch,</u> 233 F.3d 596 (D.C. Cir 2000), the court considered whether the Fifth Amendment prohibited the torture of a non-resident foreign national living abroad. Two factors were significant to the court in its analysis of whether the Fifth Amendment applied to the plaintiff, Mr. Bamaca, namely: 1) the location of the conduct at issue; and 2) the degree of connection the alien has to the United States.

Here, the conduct at issue, the refusal to process Plaintiff's applications, occurred within the United States as Department of Transportation officials, located in Washington, D.C. systematically refused to process the applications of Mexican nationals. This conduct at issue here is even more clearly located in the United States the conduct in other cases where the court has found that conduct occurred within the United States. In <u>Lamont v. Woods,</u> 948 F.2d 825 (2d. Cir. 1991), the court found that the Establishment Clause of the First Amendment was violated domestically when the U.S. Government gave grants to foreign religious schools. Additionally, when the Supreme Court analyzed this factor in <u>United States v. Verdugo-Urquidez,</u> 494 U.S. 259 (1990), and found that the conduct occurred "solely in Mexico," the

18

conduct in question was a search and seizure of a Mexican citizen's property located in Mexico and conducted by Mexican officials and U.S. Drug Enforcement Agency officials acting in concert. In contrast to this, the conduct at issue here, the denial of applications, was conducted solely by U.S. officials and occurred squarely within the United States.

The second factor, the degree of connection the alien has to the United States also clearly weighs in Plaintiff's favor. Plaintiff's are Mexican nationals who were and continue to be allowed to access U.S. interstate freeways and stay at U.S. hotels and motels as they transport their goods to Canada. Additionally, Plaintiffs were guaranteed the right to have their applications at least processed by the Department of Transportation when NAFTA was passed. Surely, the Plaintiffs here exhibit a much stronger connection to the United States than the plaintiff in Cardenas v. Smith, 733 F.2d 909 (D.C.. Cir. 1984), who was a citizen and resident of Columbia and whose Swiss bank accounts were seized pursuant to a communication from the U.S. Department of Justice. In Cardenas, the court suggested that the plaintiff would be able to show injury within the United States if she could show her accounts were seized as a result of an unlawful conspiracy within the Department of Justice.

In 1950, the Supreme Court acknowledged that aliens "[have] been accorded a generous and ascending scale of rights as [they] increase [their] identity with our society." Here, the United States has actually desired to increase the connection between its citizens and the citizens of Mexico enough to create a treaty granting property rights particular Mexican citizens. Additionally, Plaintiffs continue to legally travel through the United States as they transport their goods to Canada. In a sense, Plaintiffs' status is already akin to that of legally admitted aliens such as the plaintiffs in Yick Wo, Graham, Sugarman, and Examining Board of Engineers, Architects and Surveyors. Their identity with our society has increased and strengthened to the degree that they must be accorded with at least the right to have their property interests protected from discrimination based on their national origin.

This Court should find by analogy that when a foreign national has a property interest that has been created by statute, elimination of that interest must be done with due process of law and must be done with equal protection of the law. In this case, although plaintiffs were not

19

present in the United States for purposes of their applications and thus were not present with alien status, their applications had been invited by an act of Congress: Annex I to the NAFTA gave plaintiffs the authority to submit the applications.

When the Congress passed the NAFTA, an agreement came into effect.  The NAFTA was designed to work across a very broad range of areas not traditionally affected by a single international agreement.  Those areas include financial institutions, environmental requirements, intellectual property and professional practice.  Simply put, the passage of NAFTA created for the first time unique business and professional requirements and privileges for Mexican and Canadian citizens and businesses as they related to doing business in the United States. Conversely, U.S. persons and companies had similar requirements and privileges not required or authorized before the passage of the NAFTA.

One of those privileges was contained in the Annexes to NAFTA that pertain to land transport.  When Congress passed the NAFTA, the plaintiffs had essentially come to be in the same position as domestic truckers, able – at certain specific dates - to petition and apply for permits to operate their long-haul trucks in the United States.

The defendants failure to act on those applications eliminated the plaintiffs' interest without *any* process of law and by simple discrimination based on the fact that the plaintiffs were citizens of Mexico.  However, the President of the United States negotiated NAFTA, presumably, in good faith.  The purpose of NAFTA was to create a widely applied foreign trade policy that gave the parties to the agreement, and by the very terms of the agreement, private business entities, new rights and opportunities.  Yet, the policies continued to be practiced by the defendants directly cut against the purpose of the NAFTA and in the process, denied these plaintiffs due process of law and equal protection of the law.  The United States of America gave these plaintiffs a property interest on the one hand, and took it away with the other.  These plaintiffs deserved the same protections they would have received had they been American citizens seeking to do business in America.

     (b)    <u>The Failure to Process the Applications Was Done Under Color of Law</u>

It is axiomatic that the process for accepting applications and the regulatory process regarding the provision of permits to provide cross-border services into the United States was done under color of law.

(c)    The Failure to Process the Applications Was Without Due Process of Law

The Defendant's failure to process the applications made by Mexican citizens because they were Mexican citizens, and the failure to provide any system by which those applicants could contest the agency's action, combined to deprive the Mexican applicants of such basic due process rights as reasonable notice of a claim and a meaningful opportunity to respond.  The decision by the Defendants not to act on the applications resulted in the applicants' loss of potential business.  Such a loss was essentially a taking by the Defendants without any process of law, much less due process.  Thus, there was a flagrant violation of the Plaintiffs' due process rights.  See Arcoren v. Peters, 829 F.2d 671 (8th Cir. 1987), cert. denied, 485 U.S. 987 (1988).

## E.    PERSONAL JURISDICTION AND VENUE ARE PROPER.

When the Congress passed the NAFTA, a unique agreement came into effect.  The NAFTA was designed to work across a very broad range of areas not traditionally affected by a single international agreement.  Those areas include financial institutions, environmental requirements, intellectual property and professional practice.  Simply put, the passage of NAFTA created for the first time unique business and professional requirements and privileges for Mexican and Canadian citizens and businesses as they related to doing business in the United States.  Conversely, U.S. persons and companies had similar requirements and privileges not required or authorized before the passage of the NAFTA.

One of those unique privileges was contained in the Annexes to NAFTA that pertain to land transport.  When Congress passed the NAFTA, the plaintiffs had essentially come to be in the same position as domestic truckers, able – at certain specific dates - to petition and apply for permits to operate their long-haul trucks in the United States.

### 1.    THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS NORMAN Y. MINETTA, JOSEPH M. CLAPP, AND MARY E. PETERS.

Absent one of the three traditional bases for jurisdiction, namely: 1) Service within the state; 2) Domicile; or 3) Consent; due process requires that the defendant have "certain minimum contacts with (the forum state) such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945), Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 342. "'Minimum contacts' can be established either through contacts sufficient to assert specific jurisdiction or contacts sufficient to assert general jurisdiction." Alpine View v. Atlas Copco AB, 205 F.3d 208, 215 (5th Cir. 2000).

In determining minimum contacts, a court considers "the relationship among the defendants, the forum and the litigation." Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579 (1977). "'[O]n a motion to dismiss for lack of personal jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties affidavits must be resolved in plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists.'" Felch v. Transportes Lar-Mex SA DE CV, 92 F.3d 320, 325 FN 13 (5th Cir. 1996), quoting Bullion v. Gillespe, 895 F.2d 213, 217 (5th Cir. 1990).

Whether the forum state has personal jurisdiction over the individual depends on whether, under the particular facts of that case, the forum state has a sufficient relationship with the defendant and the litigation to make it reasonable to require him to defend the action in that state.

The determination of general jurisdiction focuses on whether the defendant has "substantial, continuous and systematic" activities within the forum state. If general jurisdiction exists, a forum court may exercise jurisdiction as to any cause of action, arising anywhere. Specific jurisdiction is found where the claim against the defendant arises out of the defendant's forum-related activities where such activities may be insufficient to establish general jurisdiction. See Perkins v. Benguet Consolidated Mining Co. 342 U.S. 437, 72 S.Ct. 413 (1952); Burger King Corp. v. Rudzewicz 471 U.S. 462, 105 S.Ct. 2174 (1985). If specific jurisdiction exists, the

forum court may exercise jurisdiction only for claims related to the individual's activities or contacts within the forum state. If the requirements of either specific or general jurisdiction are met, the forum court maintains jurisdiction over the individual.

(a).    The Defendants' Contacts With Texas Are Such That Texas May Exercise Both Specific And General Jurisdiction Over Them.

In Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482 (1984), a writer and an editor worked for the National Enquirer. Both defendants resided in Florida where they wrote and published an article appearing in California. The article allegedly defamed a California resident, who sued them in a California court.

The Supreme Court found that because defendants knew the article would have an injurious effect on a California resident, and the injury, in terms of emotional distress and damaged reputation, would be felt in California where plaintiff lived and worked, the defendants' actions were expressly aimed at California. Id. at 789. Therefore, based on the "effects" of defendants' conduct, the Court held that California had personal jurisdiction over them. Id. The Court stated "[a]n individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." Id. at 790.

Like the defendants in Calder, Defendants in the instant action assert that Texas may not maintain personal jurisdiction over them because their departments are located in another state. However, as in Calder, the Defendants knew that the implementation or continued execution of unlawful policies and practices would affect a specific class of persons in Texas. Thus, Defendants' wrongdoing was, and continues to be, intentionally directed at Texas. Furthermore, as in Calder, the harm complained of occurred in Texas. Thus, Defendants' assertions that Texas may not exercise personal jurisdiction over them are untenable.

Relying on Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d 865, 867 (5th Cir. 2001), Defendants posit that even if they were aware their actions would intentionally harm people in Texas, such harm does not subject them to jurisdiction there. (Defendants' Memorandum in Support of Motion to Dismiss, p. 23). In Panda a resident plaintiff corporation

23

brought a tortious interference action against an out-of-state company. There was no evidence that the defendant company had any contacts with Texas whatsoever. More importantly, none of the financing agreements central to the action were to be performed in Texas or had any relation to Texas other than the fortuity that plaintiff resided there. Id. at 869. Moreover, no wrongdoing was directed at Texas. Thus, Panda is inapposite to analysis of the instant action and Defendants' reliance upon it is misplaced.

The forum state may exercise general jurisdiction over the defendant, as to any cause of action, whether related to the defendant's activities or not, if his activities within the forum are "substantial, continuous and systematic." Perkins 342 U.S. 437 at 445. While the headquarters of Mr. Minetta's department, the Department of Transportation ("DOT"), are in Washington, D.C., it has field offices located throughout the United States. In fact, both The Federal Highway Administration ("FHA") and Federal Motor Carrier's Safety Administration ("FMCSA"), offices which defendants Mary E. Peters and Joseph M. Clapp respectively head, have field offices in Texas. Both the FHA and FMCSA have field offices in Austin, Texas. The FMCSA also has offices in Fort Worth, Laredo, Houston, Lubbock, Austin, and Harlington.

In the past, courts have found general jurisdiction where companies have kept offices and files in the forum and held meetings in the forum. See Perkins 342 U.S. 448 at 448. The contacts generated by the DOT's field offices are certainly greater than those generated by an office, some files and a few meetings. The mere presence of these field offices throughout Texas constitutes "substantial, continuous and systematic" activities. Therefore, Texas may exercise jurisdiction over defendants Norman E. Minetta, Mary E. Peters, and Joseph M. Clapp.

In considering whether Defendants had contacts with Texas sufficient to warrant the exercise of specific personal jurisdiction, this Court must "determine whether the present litigation resulted from injuries arising out of or related to the nonresident defendant's contacts with the forum state. [citations omitted]" Felch v. Transportes Lar-Mex SA DE CV, 92 F.3d 320, 324 (5th Cir. 1996). Specific jurisdiction is proper only if the cause of action arises from a particular act or activity in the forum. Jones v. Petty-Ray Geophysical Geosource, Inc., 954 F.2d 1061, 1068 (5th Cir. 1992). Here, the particular act of activity complained of is the

implementation and execution of an unlawful discriminatory policy and practices within the State of Texas. Plaintiffs' injury flows directly from this particular activity and also occurred in Texas. Therefore, this Court has specific jurisdiction over the Defendants.

## 2.   VENUE IS PROPER

The statute determining venue, 28 U.S.C. § 1391 states, in relevant part:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law. Be brought only in ..., (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

A showing that "a substantial part of the events or omissions" occurred in the chosen district is required so that litigation will not be unreasonably burdensome.  When determining where a "substantial part" of the events or omissions occurred, one may consider where the parties acted or where injuries occurred.  Bates v. C & S Adjusters, Inc. 980 F.2d 865 (2nd Cir. 1992); Wachtel v. Storm 796 F.Supp. 114, 116 (SD NY 1992).

As stated in the claim, a majority of the injuries that gave rise to this lawsuit occurred in the Southern District of Texas; specifically in Brownsville and Laredo.  Therefore, since the injuries alleged occurred in the Southern District of Texas, Brownsville Division, venue is proper.

## F.   PLAINTIFFS' BURDEN TO NEGATE DEFENDANTS' DEFENSE OF QUALIFIED IMMUNITY AS AN AFFIRMATIVE DEFENSE IS MET BY ESTABLISHING THAT AN OFFICIAL'S WRONGFUL CONDUCT VIOLATED CLEARLY ESTABLISHED LAW.

The threshold inquiry a court must undertake in a qualified immunity analysis is whether Plaintiff's allegations, if true, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).   Despite their participation in this constitutionally impermissible conduct, the respondents may nevertheless be shielded from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of

which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier v. Katz, 533 U.S., at 206, 121 S.Ct. 2151. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right, and in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The Court in Hope v. Pelzer found that officers who sued in a § 1983 civil action had the same fair notice right as do defendants charged under 18 U.S.C. § 242 , which makes it a crime for a state official to act willfully and under color of state to deprive a person of constitutional rights. . See Hope v. Pelzer 2002 WL 1378412, Footnote 9 U.S.,2002. Decided June 27, 2002. Moreover, "[the] Court's opinion in United States v. Lanier, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432, a § 242 case, makes clear that officials can be on notice that their conduct violates established law even in novel factual situations". See Hope v. Pelzer 2002 WL 1378412, Footnote 9 U.S.,2002. Decided June 27, 2002.

The Firth Circuit has noted the standard for qualified immunity, stating "[q]ualified immunity protects government officials performing discretionary functions from civil damages liability if their actions were objectively reasonable in the light of then clearly established law. E.g., Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)". Bazan v. Hidalgo County, 246 F.3d 481, 488 (5th Cir.2001). But in a balancing of interests, the Court also notes that "[w]hen government officials abuse their offices, actions[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.", citing Anderson, 483 U.S. at 638.

In Bazan, the Court discussed the 2-step procedure for evaluating qualified immunity. The first step is "to determine whether plaintiff alleged a violation of a clearly established constitutional right." Id. at 490. "The second step requires determining whether, as discussed supra, the official's conduct was objectively reasonable under clearly established law existing at the time of the incident." Id.

26

Plaintiffs have met the first step of this procedure by demonstrating Defendants' violation of Constitutional rights under the Equal Protection Clause and Due Process Clause of Fifth Amendment of the United States Constitution, and violation of Plaintiffs' Federal Civil Rights under 42 U.S.C. § 1981, et seq. Defendants had notice of Congress' intention to encourage Mexico and Canada to lift their restrictions on market access for U.S. firms, made evident by the signing of the NAFTA Treaty in 1992. President Clinton transmitted the NAFTA formally to the House of Representatives as house Resolution 3250 on October 4, 1993. On November 17, 1993, the House of Representatives passed the NAFTA bill by a vote of 234 to 200. On November 19, 1993, the Senate passed the same legislation. This bill became the North American Free Trade Agreement Implementation Act (Public Law 103-182, 107 Stat. 2057). The NAFTA was proclaimed into law in the United States on January 1, 1994 by President Clinton. 58 FR 69681, Executive Order 12889 of December 27, 1993. The clearly established right was equal protection based on national origin. See Plyler and Yick Wo, supra.

Additionally, Plaintiffs note under Annex I of NAFTA, the Parties to the agreement put forth that Mexican nationals would be permitted to obtain operating authority to provide cross-boundary trucking services in the four border states three years after the signing of NAFTA, or December 18, 1995, and cross-boarder trucking services throughout the United States six years after the date of entry into force of NAFTA, or January 1, 2002. Also, Annex I provides Mexican nationals would be able to invest in U.S. domiciled trucking firms three years after the signing of NAFTA, or December 18, 1995. When NAFTA became a treaty, it became the supreme law of the land. Not only do the provisions of the treaty illustrate the intent of the signatory parties and Congress to promote free trade and investment, but Defendants were further put on notice of their failure to adhere to the agreement when the Arbital Panel established to hear Mexico's dispute with the United States concerning the Land Transport provisions of NAFTA found that evidence presented at the arbitration established that as of July 20, 1999, the U.S. Department of Transportation had received 184 applications from Mexican nationals to provide cross-border services into the boarder states. See Exhibit A at paragraph 87. None of those applications were processed, denied or granted.

27

Failure to adhere to the NAFTA Treaty and failure to process applications filed by Mexican nationals based solely on their national origin was a violation of Plaintiffs rights under the Equal Protection Clause and Due Process Clause of Fifth Amendment of the United States Constitution, and violation of Plaintiffs' Federal Civil Rights under 42 U.S.C. § 1981, et seq. As such, Plaintiffs have demonstrated Defendants had notice of clearly established law, and despite this notice, violated Constitutional rights of Plaintiffs by denying a property right conveyed by NAFTA without notice and due process based upon Plaintiffs national origin.

Plaintiffs additionally have met the second step of this test by demonstrating Defendants acted in violation of their rights by instituting policies and procedures which would ensure Plaintiffs' applications would never be processed as long as they admitted their were of Mexican origin and nationality. As the Court in Bivens found the Petitioner overcame the Federal Agents' claim of qualified immunity by alleging violation of a Constitutional right while the agents acted under color of the law, this Court likewise must reject Defendants' assertion that qualified immunity could shield their denial of Plaintiffs' Constitutional rights while acting under color of the law by continuing a practice of failure to process all applications filed by Mexican nationals.

Qualified immunity can not be claimed with respect to unconstitutional conduct that involves an element of culpability that is inconsistent with a finding that the defendant acted in a reasonably objective manner. Where, for example, a government official intentionally discriminates on the basis of race, not in the context of remedying past discrimination or promoting diversity, it is simply inappropriate to assert that there was a reasonable basis for the conduct, even if the factual issues had not previously been addressed by any appellate court. See, e.g., Wade v. Hegner, 804 F.2d 67 (7th Cir. 1986) (no qualified immunity for school official who warned of racial violence in the schools to discourage enrollment of black students); Hobson v. Wilson, 737 F.2d 1 (D.C. Cir. 1984) (racially motivated infringement of rights inconsistent with immunity defense).

More analogous to this case is Kent v. Dulles, 357 U.S. 116, 78 S. Ct. 1113 (1958). In that case, the Secretary of State, John Foster Dulles, while acting pursuant to a broadly worded congressional enactment giving him the authority to issue passports, used this power to curtail

28

the right of a citizens to travel by issuing and enforcing a regulation denying passports to alleged Communists, which the passports were necessary to leave the country. The Court found that while recognizing foreign affairs power of the executive, the individual freedom to travel was paramount under the guarantee of the Equal Protection and Due Process clause of the 5th Amendment such that only Congress could regulate such freedoms. Kent v. Dulles, 357 U.S. 116, 129 (1958). As qualified immunity was not a shield to the Secretary of State in Kent when he exceeded his authority by denying passports to a class of alleged Communists, likewise, Defendants cannot claim qualified immunity as a shield to deny Plaintiffs applications based upon classification of national origin.

Qualified immunity cannot be claimed with respect to unconstitutional conduct that involves an element of culpability that is inconsistent with a finding that the defendant acted in a reasonably objective manner. Where, for example, a government official intentionally discriminates on the basis of race, not in the context of remedying past discrimination or promoting diversity, it is simply inappropriate to assert that there was a reasonable basis for the conduct, even if the factual issues had not previously been addressed by any appellate court. See, e.g., Wade v. Hegner, 804 F.2d 67 (7th Cir. 1986) (no qualified immunity for school official who warned of racial violence in the schools to discourage enrollment of black students); Hobson v. Wilson, 737 F.2d 1 (D.C. Cir. 1984) (racially motivated infringement of rights inconsistent with immunity defense). The violations in this case are not so subtle. Here, Executive Officials first asked whether applicants were Mexican nationals and then systematically refused to even process their applications pursuant to a Memo that blatantly stated that applications of Mexican citizens were not to be processed.

## III.    CONCLUSION

In sum, what the United States agreed to provide under the terms of the NAFTA – the right to make application for consideration - was paramount over the terms of Presidential Memoranda that purported to take away any meaningful consideration of those applications. The

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alpine View v. Atlas Copco AB, 205 F.3d 208, 215 (5th Cir. 2000)    22
Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)    26
Arcoren v. Peters, 829 F.2d 671 (8th Cir. 1987), cert. denied, 485 U.S. 987 (1988)    7, 21
B. Altman & Co. v. United States, 224 U.S. 583 (1912)    14
Baker v. Carr, 369 U.S. 186, 211 (1962)    10
Bates v. C & S Adjusters, Inc. 980 F.2d 865 (2nd Cir. 1992)    25
Bazan v. Hidalgo County, 246 F.3d 481, 488  (5th Cir.2001)    26
Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777 (1946)    7
Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics 403 U.S. 388, 397, 91
    S.Ct. 1999, 2005 (1971)    6, 7
Bridges v. Wixon, 326 U.S. 135, 148, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103 (1945)    5
Buckley Constr. Inc., v. Shawnee Civic & Cultural Develop. Auth. 933 F.2d 853, 859 (10th
    Cir. 1991)    8
Bullion v. Gillespe, 895 F.2d 213, 217 (5th Cir. 1990)    22
Burger King Corp. v. Rudzewicz 471 U.S. 462, 105 S.Ct. 2174 (1985)    22
Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482 (1984)    23
Cardenas v. Smith, 733 F.2d 909 (D.C.. Cir. 1984)    19
Chae Chan Ping v. United States, 130 U.S. 581, 600 (1889)    14
Connelly v. Comptroller of Currency, 876 F. 2d 1209 (5th Cir. 1989)    7
Correctional Services Corp. v. Malesko, 122 S.Ct. 515, 519 (2001)    4, 5
Cronn v. Buffington, 150 F.3d 538, 544 (5th Cir. 1998)    8
Davis v. Passman, 442 U.S. 228 (1979)    7
DiMartini v. Ferrin, 889 F.2d 922    17
Examining Board of Engineers, Architects and Surveyors v. Flores De Otero 426 U.S. 572
    (1975)    17
Felch v. Transportes Lar-Mex SA DE CV, 92 F.3d 320, 325 FN 13 (5th Cir. 1996)    22, 24
Footnote 9 U.S.,2002    26
Graham v. Richardson 403 U.S. 365 (1971)    18
Harbury v. Deutch, 233 F.3d 596 (D.C. Cir 2000)    18
Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)    26
Hedges v. Poletis, 177 F.3d 1071, 1075 (8th Cir. 1999)    8
Hirabayashi v. United States, 320 U.S. 81 (1943)    16
Hobson v. Wilson, 737 F.2d 1 (D.C. Cir. 1984)    28, 29
Hope v. Pelzer 2002 WL 1378412    26
International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945)    22
Jones v. Petty-Ray Geophysical Geosource, Inc., 954 F.2d 1061, 1068 (5th Cir. 1992)    24
Kent v. Dulles, 357 U.S. 116, 78 S. Ct. 1113 (1958)    28, 29
Korematsu v. United States, 323 U.S. 214, 216 (1944)    17
Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953)    5
Lamont v. Woods, 948 F.2d 825 (2d. Cir. 1991)    18
Mac'Avoy v. Smithsonian Institute, 757 F. Supp. 60 (D.C. 1991)    7
Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 342    22
Missouri v. Holland, 252 U.S. 416, 432-33 (1920)    14

Narenji, et. al. v. Civiletti, 481 F.Supp. 1132 (D.C. 1979)                                    17
Norton v. Village of Corrales, 103 F.3d 928, 933 (10th Cir. 1996)                              8
Oyama v. California, 332 U.S. 633, 644-46 (1948)                                               17
Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d 865, 867 (5th Cir. 2001)23, 24
Perkins 342 U.S. 448 at 448                                                                     24
Perkins v. Benguet Consolidated Mining Co. 342 U.S. 437, 72 S.Ct. 413 (1952)                 22, 24
Plyler v. Doe, 457 U.S. 202, 211-212, 102 S.Ct. 2382, 2391-92, 72 L.Ed.2d 786 (1982)           5
Russian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931)      5
Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)                   25, 26
Schweiker v. Chilicky, 487 U.S. 412 (1988)                                                     10
Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579 (1977)                              22
Sugarman v. Dougall 413 U.S. 634 (1973)                                                         18
Swint v. City of Wadley, Alabama, 51 F.3d 988, 1000                                             8
U.S. v. Verdugo, 494 U.S. 259, 262 (1990)                                                    6, 18
United States v. Lanier, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432                          26
United States v. Pink, 315 U.S. 203 (1942)                                                      14
Wachtel v. Storm 796 F.Supp. 114, 116 (SD NY 1992)                                             25
Wade v. Hegner, 804 F.2d 67 (7th Cir. 1986)                                                  28, 29
Whitacre v. Davey, 890 F.2d 1168 (1989), cert. denied, 110 S.Ct. 3301 (1990)                    7
Williams v. Meese, 926 F.2d 994 (10th Cir. 1991)                                                7
Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896)          5
Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886)              5, 18

**FEDERAL STATUTES**

18 U.S.C. § 242                                                                                26
28 U.S.C. § 1391                                                                               25
28 U.S.C. §1331                                                                                 4
42 U.S.C. § 1981                                                                          9, 27, 28
North American Free Trade Agreement Implementation Act (Public Law 103-182, 107 Stat.
    2057                                                                                    13, 27
Trade Act of 1974, 19 U.S.C. §§ 2101, 211-2112, 2191 (1988)                                    13
U.S. Const. art. VI, § 2                                                                       14

**OTHER AUTHORITIES**

Ackerman and Golove, 108 Harv. L.Rev. 799 at 805                                            14, 15
FR 69681, Executive Order 12889                                                             13, 27

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| GUILLERMO BERRIOCHOA LÓPEZ; TRANSPORTES INTERMEX, S.A. de C.V.; S' ANTONIO TRANSPORTES, S.A. de C.V.; JOSÉ SILVINO MAGAÑA LÓPEZ; JOSÉ ALFREDO MAGAÑA LÓPEZ; MIGUEL ÁNGEL DE LA ROSA SANCHEZ; SERVICIO TÉCNICO AUTOMOTRIZ PERISUR, S.A. de C.V.; TOMAS DE LA ROSA PARRA; ERNESTO VALLET HACES; MAX E. BARTON; CARLOS BERRIOCHOA, | ) ) ) ) ) ) ) ) ) ) ) ) | **C.A. No. B-01-208** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| NORMAN Y. MINETTA, Secretary of Transportation, ET AL, | ) ) ) ) | |
| Defendants | ) ) ) | |

**OPPOSITION TO MOTION TO DISMISS**

<u>TABLE OF CONTENTS</u>

I.     INTRODUCTION...................................................................................1

II.    ARGUMENT.......................................................................................4

A.     THIS COURT HAS JURISDICTION TO HEAR THIS CASE UNDER ITS
       GENERAL JURISDICTION TO DECIDE ALL CASES ARISING UNDER THE
       CONSTITUTION, LAWS, OR TREATIES OF THE UNITED STATES AND
       UNDER A BIVENS THEORY...................................................................4

B.     PLAINTIFFS HAVE STANDING TO BRING ACTION IN THIS COURT BASED
       UPON CONSTITUTIONAL GUARANTEES OF THE 5TH AND 14TH
       AMENDMENTS...................................................................................5

C.     A BIVENS THEORY IS APPLICABLE IN THIS CASE AND PROVIDES A
       REMEDY TO PLAINTIFFS FOR DEFENDANTS' WRONGFUL TAKING OF A
       PROPERTY INTEREST WITHOUT DUE PROCESS OF LAW.....................6

       1.   <u>THE SUPREME COURT FIRST RECOGNIZED AN EQUITABLE REMEDY
            FOR A VIOLATION OF CONSTITUTIONAL RIGHTS BY INDIVIDUAL
            FEDERAL AGENTS IN BIVENS</u>.........................................................6

       2.   <u>SUPERVISORY PLAINTIFFS ARE LIABLE UNDER A BIVENS THEORY
            INDIVIDUALLY UNDER TWO CIRCUMSTANCES:  PERSONAL
            INVOLVEMENT IN THE ACTS CAUSING THE DEPRIVATION OF A
            PERSON'S CONSTITUTIONAL RIGHTS, OR IMPLEMENTATION OF A
            POLICY SO DEFICIENT THAT THE POLICY ITSELF ACTS AS A
            DEPRIVATION OF CONSTITUTIONAL RIGHT</u>.....................................8

       3.   <u>PLAINTIFFS RECOVERY FOR DAMAGES FROM DEFENDANTS'
            VIOLATION OF CONSTITUTIONAL AND STATUTORY RIGHTS WHILE
            ACTING UNDER COLOR OF THE LAW IS PARAMOUNT TO
            DEFENDANTS' FLAWED ASSERTION THAT SPECIAL FACTORS EXIST.</u>9

D.     NAFTA IS SUPREME LAW AND PROVIDES MEXICAN NATIONALS THE
       RIGHT TO SUBMIT APPLICATIONS FOR PERMITS TO PROVIDE
       CERTAIN TRANSPORTATION SERVICES IN THE UNITED STATES ON
       SPECIFIC DATES...............................................................................12

       1.   <u>NAFTA WAS PROPERLY ENACTED INTO FEDERAL LAW</u>..............12

2. **NAFTA IS PARAMOUNT TO PRESIDENTIAL MEMORANDA IMPOSING A MORITORIUM ON MEXICAN TRUCKING IN THE UNITED STATES ..14**

3. **NAFTA PROVIDES MEXICAN NATIONALS THE RIGHT TO SEEK PERMITS TO PROVIDE LAND TRANSPORT SERVICES IN THE UNITED STATES...**................................................................**15**

4. **APPLICATIONS MADE BY RIGHT WERE NOT CONSIDERED AND RESULTED IN A TAKING WITHOUT DUE PROCESS OF LAW**..............**16**

(a)   The Plaintiffs had a Property Interest Pursuant to NAFTA..........................**17**

(b)   The Failure to Process the Applications Was Done Under Color of Law.........**20**

(c)   The Failure to Process the Applications Was Without Due Process of Law

E. **PERSONAL JURISDICTION AND VENUE ARE PROPER**.............................**21**

1. **THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS NORMAN Y. MINETTA, JOSEPH M. CLAPP, AND MARY E. PETERS.....21**

(a) The Defendants' Contacts With Texas Are Such That Texas May Exercise Both Specific And General Jurisdiction Over Them.......................................**23**

2. **VENUE IS PROPER**.............................................................................**25**

F. **PLAINTIFFS' BURDEN TO NEGATE DEFENDANTS' DEFENSE OF QUALIFIED IMMUNITY AS AN AFFIRMATIVE DEFENSE IS MET BY ESTABLISHING THAT AN OFFICIAL'S WRONGFUL CONDUCT VIOLATED CLEARLY ESTABLISHED LAW**...........................................................................**25**

III. **CONCLUSION**.......................................................................................**29**